Case No. 14-6533, United States of America v. Betsy Hillis, oral argument not to exceed 15 minutes per side. Peter J. Strians, for the appellant, you may proceed. Good morning. Peter Strians of the Nashville Bar here on behalf of defendant appellant Betsy Hillis, and I'd like to reserve three minutes for rebuttal at this time. Ms. Hillis appeals her from the final judgment of the United States District Court for the Eastern District of Tennessee in the Chattanooga Division. This was a methamphetamine manufacturing conspiracy case. She appeals from the judgment of the District Court where she received a minimum mandatory sentence of 120 months. This case is the same sad refrain that I know that the panel has heard in many prior cases. Ms. Hillis was indicted in a multi-defendant methamphetamine conspiracy case. She was probably the least involved of all the defendants that were indicted, even under the government's theory. Her decision to go to trial gave the co-defendants an opportunity to testify and get significant reductions in their sentences. The co-defendants, as you can see from the record, all had multiple prior federal methamphetamine trafficking convictions and basically received significant reductions as a result of their testimony. The government's theory of this case as regard to Ms. Hillis was that she was characterized as a smurf, and I know that the members of the panel are familiar with that term. It was the government's theory that she would canvass pharmacies generally in southeast Tennessee and purchase pseudofedrin and was purchasing the pseudofedrin allegedly for an old abusive boyfriend by the name of Jeremy Rigsby, who testified and received a 5K substantial assistance. The government's theory was that Ms. Hillis would purchase pseudofedrin at these pharmacies in southeast Tennessee, turn the pills over to her boyfriend, Jeremy Rigsby, who then would cook those pills into finished methamphetamine product, and of course pseudofedrin was the precursor that was the essential ingredient in that, and that she was motivated to do that in exchange for methamphetamine. As you can see from the issues I raise in my brief, the cornerstone of the government's case were these challenged pseudofedrin purchase records. I think it's significant that the timing of this, these records that were gathered from several pharmacies in southeast Tennessee were what I characterize as old records in the sense that they were from the years 2008 to 2010. The testimony of the two individuals that were advanced by the government in an effort to explain why the records were kept and how the records were kept indicated that these were old manually maintained records in the sense that when the customer appears at the point of purchase, they would sign up on a piece of paper and there was no electronic scanning. They did not have the ability between 2008 and 2010 to swipe or scan electronically the driver's license. Recognizing the confrontation problems with this, I filed pretrial a motion in limine that we heard before the trial. The focus of my argument was under 8036E, the fact that the source of the information in my view indicated a profound lack of trustworthiness. I argued to Judge Mattheis, the district judge, that there was the potential of fraud, other individuals perhaps using Ms. Hillis' driver's license at the point of sale to purchase this pseudofedrin. I also relied on the confrontation clause. So this case comes to the court in a different posture than the Collins case, which the government sent a copy of via Rule 28J this week. The argument that I made to Judge Mattheis is that the business record exception should not be so broad as to permit introduction of these records that might not have even been admissible if they would have put a warm body in the witness stand at the trial. They were basically able to keep a true custodian of the records off the witness stand and therefore I had no opportunity to convict. Let's look at it. It seems to me that there are various levels of hearsay, right? If you look at the business records portion of it, you at least have records that are kept in the ordinary course of pharmacy business, right? I think that would be the government's argument, Your Honor. I know that they're kept in the ordinary course of business in the sense that the state of Tennessee requires pharmacies to maintain those records for really law enforcement purposes so police officers can check and see who's buying the precursor pseudofedrin in a certain area. Collins dealt with that much, right? I think it did, but I think Collins is really distinguishable from the problem that you have is that, yeah, maybe they're keeping the records in a way that we can trust, but we have no idea who came in and bought it. That's correct. Okay. So there I think you have to, or at least the government has to rely on the evidence, that it's not, the records themselves don't necessarily have presumptive validity in and of themselves of that first level, but you need somebody to testify what is the habit in preparation, and the habit is that you get the ID, you look at the person, they have to match, and then you record it. And so that evidence is for whatever the jury wants to give it. I mean, is it, you know, it's not that they necessarily have to believe that person who made the declaration that I'm Betsy Hollis, but that somebody came in and presented a license, it was the normal practice to match the face to the license, and that license, whether it was hers or not, was recorded, and then it's up to the jury to decide whether they believe it or not. When you have an issue of confrontation, and I think that Justice Scalia, with all due respect, would really bristle at an analysis where you don't have the ability to confront your accuser in any way, and it's particularly untrustworthy in the sense that before 2011 an individual came in and the class of employees that were supposed to be checking these driver's licenses was pretty wide open. The woman that testified from Walmart basically said that a cashier could do it, and it was only after the legislature in Tennessee tightened up the statute in 2011 and limited that class of employees at the pharmacy to pharmacists, pharmacist techs, and pharmacist interns, that you, I think, had a more reliable class of individuals that would actually go through the steps of looking at the identification and making sure that it was in order. I think you had a couple of problems prior to 2011. You have really an unknown class of employees, somebody all the way down to a cashier or somebody else, basically anybody in the store that they could put over there to deal with a customer, and you also have this allegation that other individuals were using Ms. Hillis's driver's license. The analysis that I see in some of the cases really seems inconsistent with the comments to Rule 803-6. When you take a look at the comments, it talks about the supplier of the information does not act in the regular course of business, an essential link is broken, the assurance of accuracy does not extend to the information itself, and the fact that the information could be recorded properly doesn't mean that the reporter of that information was honest or accurate in any way. This is a case where the government had an opportunity to corroborate, make some effort to corroborate these records. There was handwriting. They could have done some handwriting analysis to see if it was in fact Betsy Hillis who signed off on these pseudofedrin pills. There was the availability of video surveillance in the pharmacies. They made no effort to really go to the pharmacies themselves and say, have you ever seen this woman who was working during the relevant time? Well, what efforts did your client make or did you make on behalf of your client to show that these business records were not accurate? I mean, a lot of this depends on who has the burden of if these ought to be characterized as business records, even though you find fault with the recordkeeping aspect or the protocol. What did you do to show that the records were faulty and not accurate other than raise speculation that employees may have been negligent in the way they performed their tasks? Respectfully, that's the government's burden, Your Honor, to prove the guilt of Betsy Hillis beyond a reasonable doubt. Ms. Hillis has no burden to prove anything, as the court knows, to the jury. Well, these are business records. They're presumed to be accurate. So then if you're claiming they're not accurate, you need to show us how or why they are not accurate. I think in my cross-examination of the witnesses they advanced,  but what did you do? Well, how did you show that they were not accurate? I think I showed that they were not accurate because you have an unreliable reporter. There's the issue of whether other people were using this woman's driver's license. You have an unknown as to who. What did you do to show that the reporter was not accurate? My client testified and said that her driver's license had been taken and used by others. I advanced a witness that was discovered after trial at sentencing a woman by the name of Jessica Sturkey, who was incarcerated with one of the cooperating women, one of the key witnesses in the case, Lori Cope, who admitted to her after the trial, the evening she came back to the local holding facility, that she felt upset, she felt bad that she had used that driver's license. Okay, but you were permitted the opportunity to provide all that testimony to the jury, and the jury heard all that. The jury did not hear anything from Ms. Sturkey. That was discovered. Ms. Hillis was taken into custody upon conviction pursuant to the Bail Reform Act, and she was lodged at the same place that Ms. Cope had been lodged at, and in the course of being at that jail, she met women in the same pod that were incarcerated with Ms. Cope, and that's how we learned that information, and I brought it to the district court's attention. I thought it might have some relevance, at least on drug quantity, for sentencing. So that information came to your attention afterwards? Yes, sir. But the information about your client claiming that the driver's license was stolen, that information was presented to the jury? It was presented to the jury. All right. Thank you. Sure. Thank you. Good morning. Good morning. You may proceed. And may it please the Court, my name is Ann Marie Sivalto, and I represent the United States for the Eastern District of Tennessee. This case involves a 500-gram methamphetamine manufacturing conspiracy involving over 1,500 grams of precursor pseudoephedrine and 10 co-conspirators. The defendant asked this court to substitute her own rejected theory of the case with that of the jury's verdict. The district court rejected the defendant's theory, the jury rejected it, and so should this court. This court should reject the defendant's theory because the pharmacy records, medical records, banking records, law enforcement testimony, eyewitness testimony, and other evidence presented in the case all proved, beyond a reasonable doubt, that Betsy Hillis was involved in a conspiracy involving multiple defendants. What medical records? The defendant testified at trial that she suffered from severe allergies and a deviated septum. At trial, medical records were introduced that were not disputed. That showed that, in fact, the defendant had zero allergies and, in fact, had a prescription for a medicine that did not contain pseudoephedrine. It just seems so odd that this person who, taking everything as true, bought the pseudoephedrine ends up with the one who's in prison for this long period of time and apparently all the people that are making this stuff and selling it aren't. Well, many of the co-defendants received very harsh sentences, including Gabriel Womack, John Brandon Marsh. Gabriel Womack testified at trial. The fact of the matter is the defendant is not contesting her sentence here today, and her sentence was within the guideline range. I mean, there wasn't a lot of room. Well, in fact, the defendants, in addition to receiving consideration under Rule 5K and Rule 35 for their cooperation, the defendants also, including Ms. Hillis, benefited from the change in the guideline range, which reduced the applicable guideline range for this type of case. But what's more relevant for the issues before the court today are that the issues of the defendants and co-defendants who testified who received benefit for their cooperation, that was all placed squarely before the jury. The jury had before it all of the information regarding the co-defendant's credibility, and they made that credibility determination, and it's within the province of the jury for credibility determinations, and they rejected the defendant's testimony that her driver's license was stolen and credited the co-defendant's testimony. And the co-defendant's testimony was substantiated by the pharmaceutical records in this case and also by the banking records. The banking records were introduced without objection and were found to be business records. But the banking records showed really very few purchases. The banking records show a number of purchases, at least five purchases, in which the pattern of purchase corroborated co-defendant testimony and also showed that she purchased pseudofedrin from multiple locations, which was in line with law enforcement testimony that that indicates a pattern of purchasing pseudofedrin for the purpose of manufacturing methamphetamine. And it really only takes one purchase like that. There was also testimony from Gabriel Womack that the defendant provided her directly with pseudofedrin pills in exchange for methamphetamine. The co-defendants, who were credited by the jury, also testified that Ms. Hillis stripped matches in order to gain the phosphorus that was used to make methamphetamine and also assisted by microwaving ingredients that were used to cook the methamphetamine in addition to purchasing pseudofedrin. And the pharmacy records in this case fit squarely within the 8036 hearsay exception. Pharmacy records at issue in this case were inherently trustworthy. They were made in the regular course of the pharmacy's business in selling pseudofedrin and were therefore admissible. The district court found that the pharmacy records were admissible because the pharmacy employees who made those records were doing it within the regular course of the business, just as the pharmacy employees in Collins were engaged in the regular course of business. And the pharmacy records in Collins are slightly different here. And I would like to note for the court that the Collins case dealt with pseudofedrin transaction records that were compiled pre-2011, which are the same type of pseudofedrin transaction records here, except that in Collins this court analyzed meth check records, which is actually compiled by a public safety technology company in a database held by them. But what the court looked at that's relevant here is that the pharmacy employees who were engaged in those transactions were making those transactions in time, close to the time of the point of purchase, and that the record of those transactions were inherently reliable. What's more, the pseudofedrin transaction records here do not violate the Confrontation Clause because the Confrontation Clause is not implicated because of the nature of these types of records. The Confrontation Clause would bar any testimonial records from being introduced into evidence, even business records that may be admissible under a hearsay exception could still be barred by the Confrontation Clause. But here the Confrontation Clause is not implicated because the statements that were admitted, the pseudofedrin transaction records at issue here, were not admitted and were not created for testimonial purposes. And so they are not violative of the Confrontation Clause. The United States put forth a foundation for those records calling upon pharmacy employees who explained the training requirements and the legal requirements for keeping track of pseudofedrin purchases and explained what consequences employees and their pharmacy would face if they failed to abide by the regulations dictating the purchase of pseudofedrin. Whether Ms. Hillis was indeed the person who submitted that ID and signed for that pseudofedrin was up to the government to prove, and we submit that we did prove that. First, Ms. Hillis claimed that her driver's license had been revoked, or excuse me, had been stolen. She put that issue squarely before the jury and it was soundly rejected. The jury had before it information to disbelieve Ms. Hillis. They chose to disbelieve her because the evidence was overwhelmingly in favor of the fact that the defendant herself purchased the pseudofedrin records. The jury had before it the very records in which she signed for the pseudofedrin purchases and in which her driver's license under multiple different addresses was used. So the defendant's claims were refuted by the uncontradicted testimony, the testimony of the banking records in which she said she did not deny making any of the pseudofedrin purchases that were attached to her banking records. Well, some of her banking records also showed that she had purchased, within four minutes, of co-defendant Jeremy Rigsby. She had also purchased pseudofedrin from multiple locations on the same day, a pattern Agent Stephen Gordy indicated was something law enforcement uses to look at whether or not that pseudofedrin is being used to manufacture methamphetamine. And because of that, the jury rejected the defendant's argument and the district court properly admitted those records because they were not violative of the Confrontation Clause. To the extent the defendant seeks to have the opportunity to place that defense squarely before the jury, she, in fact, did. And the jury had before it the ability to weigh that evidence. So whether it is admissible is whether or not the record was made in the regular course of business and whether it is inherently trustworthy. Whether it's enough to prove the defendant's guilt, that goes to the weight of the evidence. Whether it is in fact true, the record doesn't show that it was in fact Betsy Hillis, but that goes to the weight of the record and not to its admissibility. And not only were the pharmacy records an important part of the case against the defendant, the record demonstrates that there was ample proof to support the jury's verdict. Four co-conspirators testified about Hillis' involvement, including that she provided pseudofedrin to manufacture methamphetamine, she stripped matches for the phosphorus to cook methamphetamine, and she provided a location for the cooks to manufacture methamphetamine. The witnesses were all cross-examined vigorously by the defendant. The pseudofedrin records were supported by the defendant's own banking records and the Department of Safety records regarding her claim that her driver's license had been stolen. Those safety records also refuted the defendant's testimony. Law enforcement officers testified as to the pattern of purchasing pseudofedrin and what that indicated. Loss prevention employees from the pharmacy explained how pseudofedrin is sold and how those records are maintained. The defendant's own medical records refuted her testimony. The defendant's banking records refuted her testimony, and the co-defendants refuted her testimony. And because of that, the verdict of the jury should stand and the judgment should be affirmed. I would like to speak to the issue of Jessica Sturgey. She testified at the sentencing hearing, and Judge Mattis listened to her testimony and determined it not to be credible. Judge Mattis specifically found that Ms. Hillis' testimony on the issue was not credible. And so the credibility determination was made for Judge Mattis, and he determined after listening to her that Ms. Sturgey's testimony was not believable. And likewise, any issue with Ms. Sturgey's testimony, which again just would be another issue regarding the weight of the evidence, discretion should be given to Judge Mattis for the credibility determination the district court made. And because of all of the proof in this case and the overwhelming evidence against the defendant and the corroborated testimony that was provided, the United States asks that the judgment of the district court and the jury be affirmed. Thank you. I'd just like to talk very briefly about the government's reliance on the Collins case, which they brought to the court via Rule 28J. I know Judge Clay wrote the Collins opinion. I think that the Collins case is really distinguishable from Ms. Hillis' situation. There was no contemporaneous confrontation clause made in the Collins case. The lawyers in Collins focused on what they perceived to be deficiencies in the qualifications of the witnesses, so the confrontation issue came to this court under a plain error analysis. And when you read the opinion, for some reason, four of the requirements of the business records exception are discussed in the body of the Collins opinion. For some reason, 8036E is not mentioned at all, and that was the thrust of my motion in limine and the thrust of my confrontation clause challenge, and that was that there was no trustworthiness on either side of the transaction. We don't know the competency of the person that was receiving the information and recording it manually, and we certainly don't know who the reporter of the information was. In the Collins case, although it may be records that were during the same relevant time period as Ms. Hillis, they had a fully automated, fully electronic meth check system where the ID had to be scanned and had to be swiped. And in Judge Clay writing the opinion talks about the government advancing an individual who is the vice president of this tech company and, as Judge Clay wrote, testified at length. If you take a look at the testimony of the two people, the man from Walgreens who was a loss prevention shoplifting guy and somebody from Walmart that they ran in at the last minute, we're talking about direct examination that was a matter of minutes. The government was extremely casual in how they presented that records evidence. And for the government to stand up here and say that those records were not testimonial really understates what their case was about. They relied exclusively on those records, used those records to convince the jury that convicted Ms. Hillis that those records corroborated the string of cooperators that testified against Ms. Hillis. They also prepared a chart that was supposed to be a calendar used as an aid as the testimony was being presented. The calendar had the pseudofedron records for each day. And for some reason that calendar ended up going back to the jury. So for the government to say that they're not testimonial, I think it ignores the issue in the case. Thank you. All right. Thank you. The case is submitted.